Argued and submitted March 4, affirmed on appeal; reversed and remanded on cross-appeals October 5, 1994

William H. FERGUSON,
*Plaintiff - Cross-Appellant,*

*v.*

John E. FERRIS,
*Defendant - Cross-Respondent,*

*and*

STATE OF OREGON PUBLIC
EMPLOYEES' RETIREMENT BOARD,
Trustee of the Retirement Fund,
*Defendant - Cross-Appellant.*

John E. FERRIS,
*Counterclaim Plaintiff - Appellant,*

*v.*

William H. FERGUSON,
and Maureen R. Ferguson,
additional party defendants
with respect to counterclaim,
*Counterclaim Defendants - Respondents.*

(90-2387-E-2; CA A79342)

882 P2d 1119

Ervin B. Hogan argued the cause and filed the brief for defendant - cross-respondent.

Thomas C. Howser argued the cause for plaintiff - cross-appellant and counterclaim defendant - respondent William H. Ferguson. With him on the briefs was Howser & Munsell. Also on the briefs were Larry C. Hammack, attorney for counterclaim defendant - respondent Maureen R. Ferguson, and David W. Green, attorney for defendant - cross-appellant State of Oregon Public Employees Retirement Board.

Before Deits, Presiding Judge, and Richardson, Chief Judge, and Riggs, Judge.

RIGGS, J.

## RIGGS, J.

Defendant Ferris (defendant) appeals from that part of a judgment dismissing his counterclaims. He argues that the trial court erred in finding that plaintiff and defendant were not partners or joint venturers in a real estate deal, and, as a consequence, failed to provide for dissolution of the partnership. Plaintiff[1] and defendant State of Oregon Public Employes' Retirement Fund (OPERF) cross-appeal from that part of the judgment ordering that the real estate be sold as a single unit at public sale. They argue that the evidence fails to establish that an in-kind partition will cause great prejudice to the owners. We affirm on appeal and reverse and remand on cross-appeal.

This litigation concerns three properties that make up Block 67 of the original Town (now City) of Medford. Those three properties are: "the parking lot," a vacant lot that occupies the southwest quarter of the block; "Cargill Court," a gutted building on the northwest quarter of the block; and "the Ebert Building," an office building occupying the east half of the block.

Plaintiff and defendant first became property owners in the block when they purchased the parking lot in 1976. At that time, they were both attorneys practicing in downtown Medford. Plaintiff was in the process of buying a nearby property, Park Place. He testified that off-street parking was critical to the Park Place deal. He learned that the parking lot was available, and that defendant's law firm was interested in buying the lot. Plaintiff contacted the firm and offered to purchase the parking lot together. Defendant's firm was in the process of breaking up, but defendant informed plaintiff that he was interested in purchasing the lot without the other members of his firm. While negotiations for the parking lot were going on, plaintiff also made an offer on Park Place, which was contingent on plaintiff's offer to buy the parking lot being accepted.

---

[1] Maureen Ferguson is plaintiff William Ferguson's wife and appeared below only as a third-party defendant with respect to defendant Ferris' counterclaims. Although she filed a notice of cross-appeal, she has abandoned her appeal. She made no claims of error regarding any of Ferris' counterclaims and has only responded to his appeal. Her arguments and interests in that response are identical to plaintiff William Ferguson's.

Before the deal on the parking lot closed, plaintiff learned that the adjacent apartment building, Cargill Court, was also for sale and could be purchased relatively cheaply. He informed defendant of the apartment building's availability, but defendant initially declined to get involved in Cargill Court. However, when plaintiff managed to arrange financing that would require a down payment of only $7,500, defendant agreed to purchase Cargill Court as well. The sale of both the parking lot and Cargill Court closed in September, 1976, and plaintiff and defendant took each property as tenants in common.

Over the next 13 years, plaintiff and defendant jointly owned and operated both the parking lot and Cargill Court with no apparent problems. Plaintiff managed Cargill Court and defendant managed the parking lot. The parking lot, which formerly was a gas station, was leveled and striped. Once plaintiff completed renovations of Park Place, his tenants occupied 50-60 of the approximately 90 spaces available in the lot. Plaintiff and defendant also individually owned other buildings in the area, and tenants of those buildings also leased spots in the parking lot at market rates. Those tenants had priority in the parking lot; if they wanted a spot, other non-tenants' leases were terminated. Defendant testified that there was no long-term agreement to do anything with the parking lot as long as no other use presented itself.

Cargill Court continued to be operated as an apartment building until late 1983, early 1984, when it was abandoned and gutted. The back of the building was torn off and additional parking was added to the lot. The shell of Cargill Court was left standing because of its "historical possibilities." Early in their operation of the parking lot and Cargill Court, plaintiff and defendant acquired a taxpayer I.D. number and opened a joint bank account. They also filed partnership returns for their operation of the parking lot and Cargill Court. Profits and losses were split, and profits from the parking lot were used to carry Cargill Court after it was gutted.

In early spring of 1989, plaintiff learned that the Ebert Building was on the market and that the owner, OPERF, might be willing to put together a good deal. Plaintiff contacted defendant on March 29, 1989, and told him about

the opportunity, but defendant was not interested. Plaintiff continued to pursue the purchase, eventually submitting an offer, but not before he told defendant of his offer. Again, defendant said that he was not interested. Plaintiff's offer was rejected. He reworked his offer and on September 5, 1989, it was accepted. One of the contingencies that plaintiff had in his offer was that a tenant renew his lease. When OPERF expressed concern about that contingency, the realtor suggested that if plaintiff waived the contingency, OPERF might be willing to structure a deal to provide funds to renovate the Ebert Building. Plaintiff communicated this information to defendant and defendant again declined to get involved.

Plaintiff continued pursuing the deal, and, in the course of negotiations, learned that OPERF might also be willing to finance the renovation of Cargill Court. Plaintiff then asked defendant if he would be interested in a deal in which the Ebert Building could be had for $500,000 with no money down and, in addition, they could borrow $300,000 to renovate the Ebert Building and $450,000 to renovate Cargill Court. Defendant said he was interested, but expressed some reservations. Negotiations continued and, on December 27, 1989, plaintiff and defendant received a loan commitment for a total of $1,250,000 from OPERF. During those negotiations and afterward, plaintiff testified that defendant "at all times reserved the right not to go forward."

As negotiations for purchase of the Ebert Building continued, problems developed in the parking lot. Plaintiff leased office space in Park Place and told the new tenant to contact defendant to arrange parking. Defendant refused to lease spaces to the new tenant, taking the position that the spaces were needed to accommodate the development of the Ebert Building. The parties arranged a meeting in late March at a local restaurant, when plaintiff explained that continued availability of parking for his tenants at Park Place was crucial to him, was the historic agreement and was the reason he had bought the parking lot. Defendant expressed concern about the availability of sufficient parking for the Ebert Building renovation. They discussed a number of possible solutions and realized they were at an impasse. Plaintiff then offered to buy defendant out and defendant replied that he

would be "happy to sell out." Defendant agreed to find an appraiser to determine what his interest was worth.

After the meeting, plaintiff returned to his office, contacted OPERF and related that defendant would no longer be involved in the purchase of the Ebert Building. In late April, plaintiff and defendant met again and defendant said his bottom line price for the buy-out was $600,000. Plaintiff left the meeting in disbelief. On May 3, 1990, plaintiff offered defendant $150,000 for defendant's interest in the parking lot and Cargill Court and advised defendant that he was going ahead with the purchase of the Ebert Building. On May 8, 1990, defendant replied that the two were partners in the purchase of the Ebert Building and that he would pursue his interests any way he had to. The Ebert Building transaction closed on May 16, 1990, with plaintiff and his wife as purchasers. OPERF, as part of the Ebert Building transaction, received a lien on plaintiff's interest in Cargill Court and the parking lot.

Thereafter, plaintiff commenced this action, requesting a partition of the two properties that he and defendant held as tenants in common: the parking lot and Cargill Court. Defendant answered and counterclaimed that plaintiff and defendant were partners or joint venturers in the purchase of the Ebert Building and the development of the whole block, asking the court to dissolve the partnership, provide an accounting and award damages to defendant for plaintiff's breach of the partnership agreement. After a trial to the court, the trial court, in its letter opinion, found that no partnership existed between the parties. The court also found that "physical partition of the property is inappropriate because of the diversity of the separate properties * * * *i.e.,* the Cargill Building and the parking lot properties." The court therefore "suggest[ed] that the parties attempt to agree on a figure" at which one could buy out the other and provided that if no agreement was reached, the parties could request a hearing. The parties failed to agree and, six months later, the court ordered a public sale to be held and specifically found that "a partition in kind would result in great prejudice to the owners," because "the value of the whole is greater than the sum of the value of the two parcels." The court then entered a judgment, dismissing defendant's counterclaims

and ordering a public sale, and also ordering that the sale shall be made free of OPERF's lien on plaintiff's interest in the two properties.

Defendant appeals and first assigns error to the dismissal of his two counterclaims. We review *de novo*. ORS 19.125(3). Defendant alleges that, in September, 1989, plaintiff and defendant entered into an agreement that established a partnership or joint venture for the purpose of developing Block 67 as an economic unit. ORS 68.110 defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." When one party alleges the existence of a partnership or joint venture, the rule is that such an arrangement is never presumed and "the burden of establishing it is upon the party who alleges it." *Dean Vincent, Inc. v. Russell's Realty*, 268 Or 456, 464, 521 P2d 334 (1974).[2] Both plaintiff and defendant focus their arguments on whether or not they were partners or joint venturers in the parking lot and Cargill Court. However, that determination is not crucial to our resolution of this case. Whatever their status with regard to those two properties, defendant's counterclaim and, more importantly, his claim for a greater value of the real estate are dependent on the partnership being one for the development of "the entire block as an economic unit."

The evidence reveals that, before negotiations for the purchase of the Ebert Building, neither party had any intention to develop the block as a whole. Defendant testified that he and plaintiff had discussed long term prospects for the parking lot, but that they were "fairly vague as to what we [were] going to do." Their plan was to use the parking lot for parking for "as long as we had no other use for it." The record shows that they considered a number of possibilities for Cargill Court. Defendant testified that they held onto it for "the historical possibilities for the building," and they obtained a nomination to the National Register of Historic Places. They explored the possibility of state and federal funds to renovate Cargill Court as low-income housing. But

---

[2] A partnership for a single transaction is a joint venture. *Stone-Fox, Inc. v. Vandehey Development Co.*, 290 Or 779, 783, 626 P2d 1365 (1981). The law of partnership governs joint ventures. *Fitzgibbon v. Carey*, 70 Or App 127, 129, 688 P2d 1367 (1984).

there is no indication of a scheme to develop the whole block; any such partnership could only have arisen during the transaction involving the Ebert Building.

In *Hayes v. Killinger*, 235 Or 465, 471, 385 P2d 747 (1963), the Oregon Supreme Court held that

> "the essential test in determining the existence of a partnership is whether the parties intended to establish such a relationship."

After a careful examination of the record, we find that defendant failed to demonstrate that the parties intended to establish a relationship to develop the block as an economic unit. The financing deal, which included money for the renovation of both Cargill Court and the Ebert Building, lends credence to the idea that the two renovations were tied together. In addition, that opportunity to develop the two buildings may have enticed defendant to enter into the deal. However, plaintiff never indicated that he felt the two renovations were part of a larger scheme to develop the whole block. He testified that the two deals were not dependent on each other; he planned to go ahead with the deal on the Ebert Building without Cargill Court involved in any way.

Our conclusion is further supported by the disagreement over parking. Plaintiff originally purchased Park Place contingent on his purchase of the parking lot; tenants from Park Place had consistently used between 50 and 60 spaces in the lot. It is clear that plaintiff never considered the parking lot as a part of the Ebert Building transaction. Regardless of plaintiff and defendant's relationship as to the parking lot and Cargill Court, defendant failed to establish that they formed a partnership or joint venture with the intent to develop the block as a whole.

Because of our conclusion that defendant failed to establish a partnership to develop the entire block, we need not reach defendant's second assignment of error regarding the court's failure to provide for the dissolution of the partnership.

Plaintiff and OPERF cross-appeal and assign error to the trial court's order that the parking lot and Cargill Court be sold as a single unit. Once again, we review *de novo*.

ORS 19.125(3). A court may order a sale of property under ORS 105.245 if it appears

> "that the property or any part of it is so situated that partition cannot be made without great prejudice to the owners * * *. Otherwise, * * * it shall decree a partition according to the respective rights of the parties."

The established test of whether a partition in kind would result in great prejudice to the owners is

> " '[w]hether the value of the share of each in case of a partition would be materially less than his share of the money equivalent that could probably be obtained for the whole.' " *Haggerty v. Nobles*, 244 Or 428, 433, 419 P2d 9 (1966) (quoting *Indemd. v. Comstock*, 131 Wis 16, 18, 110 NW 786 (1907)).

The trial court found that a partition in kind would result in great prejudice, apparently because the value of the two properties combined is greater than the sum of their individual values. However, the only evidence in the record as to the value of the parcel as a whole was from defendant's appraiser, who testified that

> "the best way to market this property would be as a whole property. I wouldn't split it if I was going to market it * * * I think it would take it into its highest and best use and give the best return to a potential *buyer*." (Emphasis supplied.)

That testimony is not sufficient to constitute the "great prejudice" required before a court can force the parties to sell their property. In *Haggerty v. Nobles, supra*, the Oregon Supreme Court affirmed a trial court's order that a 680 acre parcel of land be sold. The court, after a "painstaking examination of the testimony," found that partition in kind would result in tracts of land that "would have small value because no one could make a living on [them]" and that a partition in kind and sale of the remainder would also result in great prejudice because the larger tract would have no economic viability without the outbuildings and access to water that the small tract would have. 244 Or at 435-36.

In this case, both the parking lot and Cargill Court would have value as separate tracts and would remain economically viable as seperate properties. In addition, the testimony of defendant's expert was insufficient to establish

that defendant's share of the money that could be obtained from sale of the whole would be "materially less" than the value of his share from a partition in kind. *See Doan v. Doan*, 208 Or 508, 302 P2d 565 (1956) (speculative evidence of a possible higher price not enough to establish great prejudice). Accordingly, we reverse the order requiring a unitary sale and remand for a partition in kind. Because OPERF's lien is only on plaintiff's interest in the combined parking lot and Cargill Court, its lien should follow plaintiff's interest and attach only to that portion that plaintiff receives in the partition. Defendant's property should take free of OPERF's lien.

Affirmed on appeal; reversed and remanded on cross-appeals.